# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0632-22

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

R.M.V.,

      Defendant-Appellant,

and

L.E.V. and G.P.V.,

      Defendants-Respondents.

_____

IN THE MATTER OF R.V.
and E.V., minors.

_____

Submitted May 15, 2024 – Decided October 1, 2024

Before Judges Vernoia and Walcott-Henderson.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Somerset County, Docket No. FN-18-0104-21.

Jennifer N. Sellitti, Public Defender, attorney for appellant R.M.V. (Catherine Reid, Designated Counsel, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent Division of Child Protection and Permanency (Sara M. Gregory, Assistant Attorney General, of counsel; Nicholas Dolinsky, Deputy Attorney General, on the brief).

Jennifer N. Sellitti, Public Defender, attorney for respondent L.E.V. (Clara S. Licata, Designated Counsel, on the brief).

Jennifer N. Sellitti, Public Defender, attorney for respondent G.P.V. (Robert W. Ratish, Designated Counsel, on the brief).

Jennifer N. Sellitti, Public Defender, Law Guardian, attorney for minor E.V. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Julie E. Goldstein, Assistant Deputy Public Defender, of counsel and on the brief).

Jennifer N. Sellitti, Public Defender, Law Guardian, attorney for minor R.V. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Todd Wilson, Designated Counsel, on the brief).

The opinion of the court was delivered by

WALCOTT-HENDERSON, J.S.C. (temporarily assigned).

2

In this Title Nine case, defendant R.M.V. (Rae) appeals from three orders: an August 10, 2021 order finding that she abused and neglected then-five-year-old E.V. (Elle), through the infliction of excessive corporal punishment by submerging the child's feet in scalding water causing second-degree burns; a September 12, 2022 order that terminated the Title Nine litigation and continued sole physical custody of Elle and her sister R.V. (Ruby) with their father, defendant L.E.V. (Len); and an October 3, 2022 order denying Rae's motion for reconsideration.[1]  Unpersuaded by Rae's arguments, we affirm the challenged orders.

## I.

Rae and Len were previously married but divorced in 2019.[2]  They are the biological parents of G.V. (Gina), born July 3, 2000, and Ruby, born July 11, 2010, and are the non-biological parents of Elle, born March 20, 2009.  Elle is the biological child of G.P.V. (Gail).  Elle was born in Peru and placed in the care of Len and Rae, and the couple raised her as their daughter after

---

[1]  We use initials and pseudonyms to protect the identity and privacy of the individuals and the record of this proceeding.  R. 1:38-3(d)(12).

[2]  The record on appeal does not include the final judgment of divorce or the specific date of the parties' divorce.

A-0632-22

immigrating to the United States. The record does not include any evidence of a formal adoption of Elle or legal proceeding in which Gail relinquished her parental rights to the child.[3] The record also does not contain the identity of Elle's biological father.

Prior to Rae and Len's divorce in 2019, Gina, Ruby, and Elle resided with Rae and Len in their home in Hillsborough. The family's involvement with the New Jersey Division of Child Protection and Permanency (Division) is extensive and includes approximately forty-one referrals over a two-and-one-half year period from November 2017 to July 2020.[4] Prior to and during the Title Nine proceedings, Rae and Len also had pending cases in the Family Part under the domestic violence (FV) and matrimonial (FM) dockets. Additionally, Rae had a pending child support case against Gail under the non-dissolution

---

[3] The record does not include any evidence establishing Rae and Len's status as Elle's legal guardians. In an April 24, 2023 brief on behalf of Gail in support of Rae's motion for summary disposition, Gail claims "she gave physical custody [of Elle] to Rae and [Len], she never gave up legal custody."

[4] While there were many other allegations lodged in the forty-one referrals during this period of time, we limit our discussion to the three Child Protection Services (CPS) referrals which are relevant to the allegations underlying the Title Nine litigation initiated by the Division. Thus, we review only the three CPS referrals initiated on November 14, 2017, July 29, 2019, and July 2, 2020.

(FD) docket.[5]

Pertinent to this appeal is a November 14, 2017 referral made by Detective Scott William McCarthy of the Hillsborough Police Department to the Division concerning allegations made by Gina against her mother, Rae. At that time, Detective McCarthy was investigating Rae's report that then-seventeen-year-old Gina had run away from home. After Detective McCarthy located Gina in a neighboring town, Gina alleged that Rae had not only abused her, but had also burned her younger sister, Elle, with hot water and a curling iron, and that Elle had visible scars on her feet from Rae holding her feet in scalding water.

Detective McCarthy contacted Rae and asked her to bring her younger daughters—Ruby and Elle—to the station where he examined their feet. Detective McCarthy later testified at the fact-finding hearing that he could not say whether the children Rae brought to the station were in fact Ruby and Elle. Observing no burns on the children's feet, Detective McCarthy did not file any charges against Rae, but did refer the allegations of abuse to the Division.

In any event, there is no dispute that Elle has visible scarring on both of

---

[5] The record reveals very little on the FD action. There was a singular reference to the matter at the dispositional hearing on October 18, 2022, where Gail's attorney stated, "I understand there's a child support matter pending against my client even though [Gail] has no legal custody interest at this time with [Elle].

her feet that was caused by burn injuries she suffered from scalding water from the bathroom of the family home. Rae did not dispute those facts and conceded them. She disputed only the manner in which Elle suffered the burns and who was responsible for causing them.

During the Division's 2017 investigation, Gina told Division caseworker Jeniel Gorrell that a year earlier Rae had burned Elle's feet while she was in the bathtub. Specifically, Gina recounted that she "heard [Elle] screaming about the water being too hot and she was burned very badly on her foot." When Gorrell asked Gina if Rae had done it on purpose, Gina told her that she did not know if her mother meant to do it and "[m]y mom will tell you it was an accident." Gorrell's report reflects that during her interviews with other family members, including Len and Rae, they acknowledged and reported that Elle had burns and scarring on her feet.

The Division's investigation summary also noted Rae had reported that more than a year earlier, she stepped out of the bathroom for a couple of seconds while bathing Elle and Elle turned on the hot water and accidentally burned her right foot. Rae also reported that at the time of the incident, she was very stressed because she and Len were having marital issues. During the 2017 investigation, Elle, age eight at the time, and Ruby, age seven, denied being

6

burned by Rae, either by accident or on purpose. The Division deemed the allegations of abuse against Rae "not established" and determined the children were safe in their parent's care at that time.[6]

Nearly two years later, on July 29, 2019, the Division received another referral which prompted another investigation into allegations of abuse or neglect involving the family. Specifically, Division caseworker Celeste Huggins reported to the family home to investigate an allegation that Rae made "[Elle] do chores like an adult and will wake her at 3:00 am . . . and that [Elle] has a burn scar on her leg that was intentionally caused by the mother." On the same date, Huggins interviewed Len who stated that "when [Elle] was about five years old is when he believed the incident occurred with her being burnt" and that it was his daughter Gina who had informed him of the incident. Len also stated that police investigated the allegation but that he believed that "[Rae] [had] presented [Ruby], to the officer and not [Elle]," thereby suggesting that is the reason Detective McCarthy did not observe any burn scarring on what he

---

[6] The Division is charged with the responsibility to investigate all allegations of child abuse or neglect. Pursuant to its operational regulations, the Division's investigation into such allegations can result in one of four possible determinations. An allegation can be substantiated, established, not established, or unfounded. N.J.A.C. 3A:10-7.3(c). "Different consequences flow from each of those designations." S.C. v. N.J. Dep't of Child. & Fams., 242 N.J. 201, 211 (2020).

A-0632-22

understood in 2017 were Elle's feet.

When Division caseworkers interviewed Elle, who was then ten years old, regarding the allegations that Rae had burned her feet, Elle reported that she did not remember how old she was when she was burned but that her mother tells her that when she was little she "was giving her a bath and [Elle] started playing with the faucet knobs and turned on the hot water and that is how her foot got burned." According to the Division's investigation summary, when Elle was asked if she remembered anything about the incident, Elle's response was "I do, but it is kind of the opposite of what my mom says." Elle "remember[ed] asking for a cookie and her mother saying no but she took it anyway so her mother got upset and she got in trouble."

A Division caseworker also interviewed Rae in July 2019, who reported that she did not recall when the incident took place, but that Len was the only one that would give Elle a shower. Suggesting the burns to Elle's feet were caused accidentally and by an inadvertent change in the water temperature, Rae also reported that there had been a landscaper working at the home at the time and the water temperature may have been affected as a result. Rae also stated that "[Len] had done something to the water heater and when he was giving [Elle] a shower she was burnt."

Later in the interview Rae also told the caseworker that she believed the incident had occurred in 2013. The caseworker explained to Rae that the 2019 referral pertained to Elle "being burnt on her leg and doing chores in the early morning hours." Rae agreed to a Children's Protection Center (CPC) evaluation for physical abuse and to complete a risk assessment.

On July 2, 2020, the Division received another CPS referral from a Care Management Organization (CMO) employee who had been working with the family, expressing concerns about Ruby and Elle following an alleged domestic violence incident involving Gina and Rae. On July 4, 2020, Division caseworkers, Veronica Colombo and Michelle Marchese, reported to the family home to interview Gina, Elle, and Rae. Gina reported that she and Rae had gotten into a physical altercation after Rae prevented Gina from leaving the house with Elle to get ice cream. During this investigation, Gina again raised the previously reported bathtub incident involving Elle and stated that when she was about ten years old, Rae was angry with Elle for "taking a cookie, 'I think'" and put Elle in the bathtub, turned on the hot water, and stuck her feet in it as a form of discipline. Gina stated she could "remember hearing [Elle] scream" from her bedroom and that when she "ran to the bathroom to see what was happening" she could see that Elle was in pain because "she was crying but

trying to hold back tears."

Gina also recalled seeing Rae "carry [Elle] to her room wrapped in a towel" and having to go with her father to the store to purchase first aid supplies. She further stated that after the incident, she "saw [Elle's] wrists duct taped to her bed frame" and that when she asked Rae why this was done, and Rae told her that "it was so [Elle] could not touch her feet." Gina could not recall whether Rae or Len sought professional medical care for Elle's injuries following the incident and did not recall any Division caseworkers coming to the home to speak to Elle about the incident "until years later."

Later that same day, caseworkers Colombo and Marchese interviewed Elle, then eleven years old, about the burns on her feet and noted that Elle's recollection had changed once Rae was no longer in listening range. Elle told the caseworkers that she "know[s] what [her] mother told [her] and what [she] remember[s]," suggesting that there were two versions of the story. According to the Division report,

> [Elle] explained she wanted cookies, but her mother said 'no.' [Elle] explained she took a chair[,] climbed up on the chair, reached for the cookies and ate some. [Elle] explained her mother came downstairs and caught her eating the cookies, grabbed her off of the chair and brought her into the bathroom and tried to put her into a bathtub of 'hot water.'

10

In this July 2020 interview, Elle explained that she was aware that the water was hot because she "could see the steam coming off the water and out of the [faucet]." Elle stated that she "fought with her mother and tried to place her feet against the side of the tub to prevent her mother from being able to put her feet into the water, but [her mother] 'forced (her) into the [scalding] water.'" Elle remembered that she screamed because the hot water was burning her feet. Asked whether she recalled having her hands bound to the bed, Elle said "mom said it was so I couldn't touch my feet." Elle denied receiving medical attention, but recalled she was unable to walk due to the pain. In response to Marchese's question why she had not told other caseworkers or police when she had been questioned previously about the incident, Elle explained that she did not know and Rae had told her to say "dad did it to me."

Marchese also spoke with Rae about the scarring on Elle's feet. Rae stated that the burn injuries on Elle's feet had already been investigated, although she did not mention the investigation that had been initiated by the Division following the July 29, 2019 CPS referral. When the caseworker inquired whether Elle had received any follow-up medical care for the burns to her feet, Rae was not responsive and instead "began talking about how the girls['] primary doctor moved." Rae eventually affirmed that she did not seek out immediate

medical care for Elle for the burn injuries she had sustained because "her husband told her not to" and "it was an accident and [Elle] did it to herself."

On August 25, 2020, following its investigation, the Division filed a verified complaint for care and supervision of Ruby and Elle with restraints against Rae and Len alleging abuse and neglect under N.J.S.A. 9:6-8.21, and for the custody, care, and supervision of the children under N.J.S.A. 30:4C-12. The complaint alleged that between 2013 and 2014, Rae had physically abused Elle by forcing her to put her feet in a bathtub of scalding hot water as punishment for taking a cookie without Rae's permission, and that as a result, Elle sustained severe second-degree burns for which Rae and Len failed to seek immediate medical attention.

That same day, Elle was examined by Gladibel Medina, M.D., a clinician in child abuse pediatrics and medical director at the Dorothy B. Hersh Child Protection Center, to determine if the scarring on Elle's feet was consistent with her statements about being held in hot water by Rae. During the interview, Elle repeated to Dr. Medina what she had reported to the Division caseworkers in July 2020. Elle explained that there were two stories: what she remembers happening and what her mother told her to say. Dr. Medina noted significant scarring on both feet, found the scarring consistent with Elle's recollection of

the incident, and described the scarring as consistent with second- and third-degree burns.

Dr. Medina reported that Elle was "adamant" that what Rae told her was not what she recalls happening. Dr. Medina concluded that "if the burn happened in the context of corporal discipline . . . it would constitute physical abuse because according to [Elle] she was screaming that it hurt yet her mom continued to hold her in place anyway." Dr. Medina also concluded that the failure to take Elle to the doctor to have the burns treated constituted medical neglect.

Karelyn Milaro Gonzalez-Cruz, Ph.D., a clinical psychologist later admitted as an expert in child psychology and trauma at the fact-finding hearing, conducted a mental health evaluation of Elle on August 25, 2020, and authored a report detailing her findings. Dr. Gonzalez-Cruz diagnosed Elle with post-traumatic stress disorder, persistent depressive disorder, and child affective bipolar relationship distress. Elle described how she was confused by how Rae had treated her and was afraid of Rae, and Elle explained how Rae presented differently when other people were around. Elle described how Rae treated her and Ruby differently, noting Ruby is Rae and Len's biological child, and recounted the incident of Rae submerging her feet in scalding water as

13

punishment, explaining again that there was the version she remembered, and the story Rae had told her. Dr. Gonzalez-Cruz recommended that Elle continue receiving intensive trauma-focused therapy, that Rae and Len complete psychological evaluations, and that the Division continue to closely monitor the family.

On September 2, 2020, Judge Julie M. Marino held a hearing on the Division's complaint and entered an order granting the Division care and supervision of Ruby and Elle. The court continued Rae and Len's joint legal and physical custody of both children but ordered their parenting time to be supervised on alternating weeks. The court also ordered that Rae and Len undergo psychological evaluations. By this time, Rae and Len had finalized their divorce.

At the next hearing on November 17, 2020, the court modified its order and permitted Len unsupervised parenting time based on the court's review of his psychological evaluation. The court noted that Rae's evaluation "indicated that her emotionality interferes with her parenting . . . [and Rae] was shown to have [deficits] in empathy and poor decision making" and that her parenting time should remain supervised, considering her diagnosis of narcissistic personality disorder.

14

The Division also disclosed that Rae had been arrested earlier that month for violating an active restraining order Len had filed against her, as well as the terms and restrictions imposed on her supervised parenting time as set forth in the court's September 2, 2020 order. As a result, the court modified its order and awarded temporary, physical custody of Ruby and Elle to Len. The order allowed Rae's continued supervised parenting time with Ruby and Elle, and the court advised Rae that physical custody could be restored if she participated in the services provided by the Division and demonstrated compliance with the court orders. The court also scheduled the fact-finding hearing to commence on March 22, 2021.

## II.

On March 19, 2021, three days prior to the scheduled fact-finding hearing, Rae's counsel requested an emergent hearing to address "a complicated and confusing situation [requiring] the [c]ourt's intervention." Rae was not present for this hearing and it proceeded via Zoom with counsel for each of the parties. Counsel advised the court that Rae wanted to represent herself and that counsel did not "know if [she was] representing [Rae], if [Rae was] representing herself,

if the [c]ourt is going to have [her] remain until Monday, . . . or if the court want[ed] [her] to be standby counsel."[7]

To provide context for the court about the nature of her concerns and Rae's reason for wanting to represent herself, counsel shared that Rae had stated counsel was not "effective enough" in regaining Rae custody of the children and Rae wanted her counsel to release copies of the Division's confidential documents to her, including the psychological evaluations for Elle and Rae. Counsel also discussed prior incidents of Rae sharing confidential emails about the case with third parties and other counsel in the litigation. That assertion was separately confirmed by counsel for the other parties in this litigation.

On March 22, 2021, prior to the start of the fact-finding hearing, Len waived his right to a fact-finding trial and administrative appeal and stipulated to medically neglecting Elle. He also agreed to comply with the Division's services.

The judge next addressed Rae's application to represent herself and for an

---

[7] In attendance were: counsel for the Division from the Office of the Attorney General, counsel for Rae, who requested the conference, counsel for Len, and Gail, and Law Guardians representing Ruby and Elle.

16

adjournment of the impending fact-finding hearing.[8] Rae requested an adjournment claiming that she had not received "full discovery" or reviewed discovery with counsel. The court determined that Rae's counsel had "received what she needed to receive from the Division" and that there were "some documents that [Rae was] not permitted to have . . . because of their confidential privileged nature." The court denied Rae's request for an adjournment and proceeded to question Rae on her application to represent herself.

The court questioned Rae about her educational background, confirmed Rae understood and spoke English, advised Rae that if permitted to represent herself, she would "be held to the same standard as the other attorneys in the case," confirmed that Rae understood that she was waiving her right to counsel, and granted her request for an ADA accommodation—to use a prepared timeline of events during the hearing.[9]

The judge also explained to Rae that

---

[8] Rae noted that she had submitted a letter that morning, via fax, to all counsel and the court seeking an adjournment and expressing her desire to represent herself. The court did not have her letter.

[9] Rae sought and the court granted her an accommodation under the Americans with Disabilities Act (ADA) based on her diagnosis of Attention Deficit Disorder (ADD) although the request for the ADA accommodation had been made under a different docket, not before this judge.

A-0632-22

So, do you understand though, as I was explaining, your standard, so other than your request for the [timeline], which is fine, there -- nobody can further help you, or give you information? You have to make appropriate objections if you make them. Everything is the same. There is no special treatment because you are not an attorney. Do you understand that?

In response, Rae confirmed she understood by replying "I understand that, Your Honor." In response to a question by Rae about testifying on her own behalf, the court clarified the difference in testifying as a party and appearing in the case as a self-represented litigant. The court further explained the different roles of attorneys and stated, "[y]ou are representing your interests, but that would be as in cross[-]examination, making appropriate objections, and moving in appropriate evidence" to which Rae responded, "[o]kay, Your Honor. All that I—I do understand."

Rae confirmed multiple times that she understood she was waiving her right to counsel and confirmed that she wished to proceed pro se, and the court granted her application, stating:

. . . I don't find any reason or – or problem where she can't represent herself. She is certainly intelligent. She understands what's happening. She's oriented in the situation. So, her skills aside, you know, she herself is certainly capable of representing herself. However, there is a problem here, and that problem is the confidentiality of this proceeding and the information in it.

18

> There have been numerous breaches of the confidentiality in the history of this matter by [Rae] sending other people information relevant to the sealed proceedings. And that is a huge concern for the court always. And so that creates some difficulty here.
>
> So my compromise, . . . I will allow [Rae] to proceed on her own behalf, but I am going to keep [counsel] in as standby counsel to deal with . . . those documents or you have to explain anything to [Rae], because I am not going to release those documents to [Rae] because of . . . the other numerous breaches.

The court assigned Rae's counsel to serve as standby counsel throughout the fact-finding hearing.

The trial court held a fact-finding hearing over five-days. The Division presented six witnesses: Dr. Medina, Dr. Gonzales-Cruz, Detective McCarthy, and three Division caseworkers. The Division did not request that Elle testify, and Rae made only a vague request for her "three girls" to testify near the conclusion of the fact-finding hearing; during a separate proceeding to address the Division's and the other parties' objections to Rae's witness list and proffers. The court asked Rae to provide details as to the likely testimony of all her proposed witnesses and she could not.

The Division did not request that Elle testify in the fact-finding hearing. Rae, however, requested that her "three girls" testify but also stated, "I am not –

do not want to coerce or force my girls to testify if they are not willing to testify," and "if they do not want to testify I am not -- I do not wish to force them."[10] Counsel for Ruby, Elle, and Len specifically objected to Rae's request that the children testify at the hearing. Neither the Division, nor Rae requested that the court conduct a child interview under Rule 5:8-6.[11]

Ruby and Elle did not testify and the court did not conduct a child interview of Ruby or Elle. Gina, an adult by the time of the hearing, also did not testify. The court entered eight exhibits into evidence: the Division's July 2, 2020 investigation summary; photographs of Elle from August 20, 2020; Elle's CPC medical assessment; Elle's psychological evaluation report; the Division's November 14, 2017 investigation summary; a Hillsborough police report from 2017; photographs of Elle from November 15, 2017; and the Division's July 29, 2019 investigation summary.

---

[10] The court addressed Rae's request that the children testify in a separate hearing held at the request of the Division specifically to address objections that had been made to the witnesses and evidence in Rae's proffers.

[11] Rule 5:8-6 provides that, as part of a custody hearing, the court may on its own motion or at the request of its litigant conduct an in camera interview with the child(ren).

On the second day of the fact-finding hearing, the judge acknowledged on the record there was a need for a witness list and a proffer from Rae describing the anticipated testimony of each witness she intended to call. On the third day of the hearing, the court took the time to review on the record a list of witnesses and proffer which Rae submitted via email. The judge concluded that her list remained insufficient because her email "doesn't say what [her witnesses] are going to testify about, that's the proffer." Rae failed to correct her proffer when given the opportunity by the court. At the April 26, 2021 fact-finding hearing the judge stated:

> You have no witnesses right now because you have failed three times to do an appropriate proffer, . . . you keep producing witness lists that – people that have nothing to even do with [Elle's burns] because you're trying to build some case on other issues . . . . This isn't the proper forum for that and I can't explain it any more or any better."

On March 22, 2021 Dr. Medina testified that she examined and interviewed Elle once at the Division's request, five or six years after Elle had suffered the burns to her feet. Dr. Medina's report was moved into evidence. Dr. Medina testified that Elle told her she had two versions of the incident that resulted in the burn injuries to her feet: the first is Rae told her that it was her father, Len, who had poured hot water on her feet, and the second is that she

21

recalled her mother placing her feet in a bathtub of hot water as punishment for taking a cookie without permission.  Dr. Medina further testified that Elle had second-degree burns, scarring and keloid formations on both feet, but the scarring to the right foot was more prominent, stating "the ankle region of the right foot had circumferential scarring."[12]  The doctor also explained Elle's injuries were consistent with being placed in a tub of hot water because of the "circumferential pattern, which is an all[-]around pattern around her lower extremities, up to the ankle area."  Dr. Medina opined that "[m]edical care should have been sought out immediately . . . the same day of the incident, and especially when she wasn't able to bear weight or walk."

The Division also called Dr. Gonzalez-Cruz, a clinical psychologist admitted as an expert in child psychology and trauma, who had evaluated Elle on August 25, 2020.  Dr. Gonzalez-Cruz diagnosed Elle with post-traumatic stress disorder, persistent depressive disorder, and child affective bipolar relationship distress.  Dr. Gonzalez-Cruz opined that Rae abused Elle.  She based her opinion in part on her clinical interview of Elle—during which Elle recounted several traumatic experiences involving Rae that had occurred since

---

[12]  Dr. Medina defined keloid formation as a "redundant skin or overgrowth of skin in certain areas."

she was young, including physical punishment inflicted by Rae and the burns to her feet. Dr. Gonzalez-Cruz also based her opinion on the Division's records, including investigative summaries, photographs of Elle's feet, text communications between Rae and Elle, and clinical testing, including the administration of a Children's Depressive Inventory test.[13]

Dr. Gonzalez-Cruz also testified that Elle revealed to her that after the incident, she could not walk, could not go to the bathroom, that the burns "hurt a lot," and that her hands were tied to the bed to prevent her from touching her feet. She also recalled that she was homeschooled during the time that she recovered from the burn injuries.

On the second day of the fact-finding hearing, the court adjourned Detective McCarthy's testimony because of technical issues that prevented Rae from viewing the exhibits via the Zoom screen-sharing function. The record further shows that there were other times when the court halted the proceedings to address other technical issues and to ensure that Rae was being heard and could participate in the fact-finding hearing.

---

[13] Dr. Gonzalez-Cruz also testified that she reviewed twelve investigative summaries, case plan assessments, the verified complaint, pictures, and police reports.

After Detective McCarthy had been excused, standby counsel advised the court that Rae had not submitted a substitution of attorney and expressed concern that Rae—who had sought to have her counsel relieved from representing her—wanted to "[have] her cake and eat it, too." Rae expressed her dissatisfaction with standby counsel and inquired of the court whether it could appoint new standby counsel. The court denied this request. The court again explained the role of standby counsel, stating "[i]t's just about the fact[-]finding. That's all that she's responsible for is to help you. She's passive . . . . Until you ask a question or if you need help[.]"

The court also addressed Rae's claim that she "still [hadn't] been able to be successful with actual discovery." The court noted that on multiple occasions, it had addressed and denied Rae's request to have copies of all of the records in discovery. The court explained that the alternative was that Rae could view discovery in person at the Division's office, however, she refused when her request to bring someone else with her was denied, stating "I just don't feel comfortable [with not being able to have someone with me] because I don't want the Division to say, oh, [I'm] doing this, [I'm] doing that." The court responded:

> You can't have another person for many reasons. First of all because of the confidential nature. Second, because of COVID there's still a restriction on how many people they can even have in their office . . . .

> There's no reason you [can't] go there, look through the evidence and I can't anticipate what any problem could be and what allegations are going to be made. You obviously can't take pictures of things. You can't make copies of things—and whatever the other rules are.

On the third day of the fact-finding hearing, the court set up a computer in the courtroom and made court staff available to assist Rae to prevent further technical issues. Rae chose to appear remotely and told the court she could not appear in person because she "had a call from [her] oldest and [she] had a family emergency" that required her to watch her granddaughter. The court expressed its frustration at Rae's remote appearance because of the efforts it had made to accommodate her by setting up equipment in the court room, which Rae acknowledged but nevertheless challenged, claiming that she had previously requested in-person presence at the courthouse "for my witnesses and translation services," not for herself.

Other witnesses included Detective McCarthy who had taken the initial report of the abuse allegations involving Elle from Gina after responding to Rae's report that Gina had ran away from home. Detective McCarthy testified that after locating Gina in a neighboring town, he took her to the police station where he interviewed her, and it was then that Gina made the disclosure about abuse in the home. He then asked Rae to come to the police station and advised

her to bring her younger daughters, referring to Ruby and Elle, although he did not know whether he actually met with Ruby or Elle because no identification of the children was provided.

The Division's witness Gorrell, a family care specialist and caseworker, testified that she had interviewed Elle in 2017 regarding the burns to her feet and that initially there was no indication that the injury was anything but accidental because Elle had denied that Rae had physically disciplined her by placing her feet in hot water. Gorrell further testified that both Rae and Len admitted they were home with Elle at the time and denied that the burn injuries were caused intentionally. According to Gorrell, Rae told her that Elle suffered the injuries during bath time after she had "stepped out for a couple of moments and that was when [Elle] accidentally turned on the hot running water and burned herself." At trial, Gorrell identified the two photographs she had taken in 2017 depicting the burn injuries to Elle's feet that were admitted in evidence.

Huggins, another Division caseworker assigned to investigate the burn injuries to Elle's feet in July 2019, testified that when she interviewed Elle in 2019, Elle remembered very little about the incident, except that she was running the bath and turned on the faucet and it became hot. Elle also told Huggins that she had asked for a cookie and had gotten in trouble for it. Huggins further

testified that in 2019, she was "in the house every month"—referring to the Rae and Len's family home—and had recommended that the children be evaluated at the CPC. She noted that although Len had agreed to have the children evaluated, Rae had not.

The Division next called intake worker Sarita Perrot who testified extensively about interviews the Division had with Elle beginning on July 4, 2020, concerning the incident. Perrot testified that during the first interview, Elle was shaking and appeared upset and was looking around as if to see if Rae could hear what she was saying. Elle eventually disclosed that there were two stories about how she injured her feet: the one she remembers happening and the one her mother had told her. Perrot further testified Elle said that her mother had taken her into the bathroom where there was a tub full of hot water and that her mother had placed her legs into the scalding hot water, and that she was screaming.

According to Perrot, Elle told her details about her injuries, including that she couldn't walk and explained that she did not previously disclose the incident because she was afraid of what would happen to her if she said anything. Perrot also testified that Elle told her that she did not feel safe with her mother because of the incident, arguments between her mother and Gina, and other incidents of

27

abuse perpetrated by Rae, including punishing her by placing her hands under scalding hot water.

Perrot further testified that Rae told her Elle's burns were accidental and caused by the new hot water heater which Len had just installed. However, Len had reported that he was not at home when Elle was injured and that Elle had told him the burns were caused by Rae. According to Perrot, Len admitted that he did see Elle in pain from the effects of the burns and that he did not seek medical attention for her. Perrot took photographs of Elle's feet on August 20, 2020, which were admitted in evidence.

On the last day of the hearing, Rae again requested an adjournment, asserting that she had "just [come] straight from jail" because she had been arrested and charged with aggravated assault on Elle—related to the same charges that were the subject of the fact-finding hearing. Rae also maintained that she had counsel in the criminal matter whom she wanted to assist her in the fact-finding hearing. At Rae's urging, the court contacted her sister to obtain the phone number for the attorney Rae had identified as the attorney representing her in the criminal matter. The court contacted the attorney's office on the record and when the attorney joined the call, the court permitted Rae to speak with him, via phone, in private. Rae's defense attorney did not file a substitution of

28

attorney or seek to represent her in the fact-finding hearing, nor did he seek an adjournment of the hearing on Rae's behalf.

Following Rae's conversation with the defense attorney in the criminal matter, the court denied Rae's adjournment request, stating:

> Well, you have standby counsel, so if you have questions regarding this matter, that's why we have standby counsel. I'm not going to stop this proceeding, which is almost to the end, to give -- I think it would be way too prejudicial to everybody else involved and, most importantly, to the child involved, so I'm not going to do that.

Following further colloquy with the court, Rae confirmed that she wished to testify with standby counsel present and appearing via Zoom. And, after explaining the purpose of the fact-finding hearing and instructing Rae that her testimony should be limited to the events that led to Elle's injury, the court permitted Rae to testify.

Rae testified that: the incident resulting in burns to Elle's feet occurred in 2013 or 2014 when Elle was four or five years old; she was a stay-at-home mom; during the time when they "were having work done on the house"; and Len was "in and out" of the house that day. Although she could not recall when she became aware that Elle had suffered burns to her feet, she believed that Len had placed Elle in the shower—as opposed to the bathtub—because that was his

custom. She stated that when she walked into the bathroom, she saw Elle "standing there and she—from what I can remember, she was red on her—on both of her feet. She was red and I—I didn't know what to do."

Rae further testified that when Len came home, she told him, "let's take her to the doctor's" but that he refused and yelled and screamed at her, and "[h]e didn't let [her] attend to" Elle. Rae denied ever telling anyone that Elle turned on the water by herself when she left the child unattended in the bathroom. She denied Elle's account that she had burned her feet as punishment for taking a cookie. Rae also testified that she had taken Elle to a doctor, who said her feet looked "fine," though she could not recall the doctor's name or the dates of any such visits, and referenced that the doctor prescribed an over-the-counter medication, although she could not recall the name of it.

On cross-examination, Rae testified that on the day of the incident, she did not know why Elle was in the shower as opposed to the bathtub with her sister—which is how she bathed the girls. She could not explain why she thought Len had placed Elle in the shower when she later admitted that Len was not at home and that she had called him on his cell phone and asked him to come home after noticing Elle's red feet. Rae also could not recall exactly when she had taken Elle to the doctor after noticing the burns on her feet. She did testify

30

that Len "didn't want [her] to go near [Elle]" for a few days and that she believed it was "just a couple days" after the incident that she took Elle to the doctor. The court denied Rae's request to give a "statement" at the conclusion of her cross-examination by counsel for the Division and Elle.

On August 10, 2021, following the hearing, the court placed its decision on the record finding that the Division had proved by a preponderance of the evidence that Rae had abused or neglected Elle under N.J.S.A. 9:8-21(c). The court began by addressing Rae's application to represent herself, stating "there had been a motion where [Rae] wanted to represent herself. We went through that process at that time. I ultimately granted her motion. I appointed . . . backup counsel to assist her, and that has existed throughout the fact finding."

The judge summarized the testimony of the witnesses and found the Division's witnesses credible. The court discussed at length Dr. Medina's CPC report and Elle's psychological report detailing the extent of Elle's injuries, her consistent recollection of the incident, and her delayed disclosure. The court found Elle's account of the incident and her injuries were corroborated by Dr. Medina, Dr. Gonzalez-Cruz, and Division caseworker Perrot, whereas none of the explanations provided by Rae were consistent with Elle's injuries. The court found Rae's account of the incident "extraordinarily evasive" and "replete with

contradictions." The court also noted that Rae had given implausible testimony that Len burned Elle's feet, even though she usually bathed the children, and that she had taken Elle to the doctor, despite previously telling the Division that she was not permitted to take Elle to the doctor. The court also found implausible Rae's testimony that Elle was not crying when she saw her in the bathroom after Elle had suffered the burn injuries to her feet.

Relying on Dr. Gonzalez-Cruz's testimony, the judge noted that once Elle was old enough to feel empowered to resist Rae's coaching, her account of the incident remained consistent. The judge noted that Elle had made repeated statements to Dr. Gonzalez-Cruz "that she was afraid of the consequences, because she said her mother appeared friendly around other people, but treated her very badly when no one was around," and found Elle's statements significant in understanding why she did not initially disclose what had happened to her because "if she didn't listen to what her mother told her to do, she was afraid of the consequences."

The judge discussed Elle's consistent statements to Division caseworker Perrot, Dr. Medina, and Dr. Gonzalez-Cruz, stressing Elle's statements to Perrot that she did not disclose the abuse sooner because she was afraid of what would happen if she did. The judge found Elle's statements were corroborated by the

testimony of the Division witnesses that supported the conclusion her burns were not accidental, but rather, caused by deliberate punishment. The judge also explained the decision not to compel Elle to testify, stating it was to avoid "yet another traumatic and stressful situation to cause her to have to come and talk to the judge and to be worried about consequences when she has told the consistent story to two experts and a number of Division workers."

Based on the testimony and evidence presented, the judge concluded that Rae had "caused physical abuse to [Elle] by placing her in a bathtub of hot scalding water as punishment causing a minimum of [second] degree burns to [Elle's] feet and medically neglected [Elle] by failing to obtain appropriate medical care for her thereafter[.]"

On October 18, 2021, the judge reconvened for a dispositional hearing pursuant to N.J.S.A. 9:6-8.50. Rae's failure to complete or engage in services ordered by the court was the primary issue raised during the dispositional hearing. Rae offered several explanations, including that she had her own therapist and did not want to engage in services with the Division's providers, prompting the following exchange:

> [RAE]: I am in therapy. I have been.
>
> THE COURT: But you're not in the therapy I asked you
> to be in.

[RAE]: But, Your Honor, that's the Division's doctor.

THE COURT: And I will take that as a no then that it's not your plan to—

[RAE]: I have my own therapist that I go see.

THE COURT: That's fine. Then that's a no. So actually we'll save time, because she's apparently not going to participate in that family therapy. So, the Division needs to figure out what we're doing. All right. I mean, we're just spinning in circles. So, what are we doing if we're not moving forward to reunification?

. . . .

THE COURT: All right. So they want to do an updated assessment so they can figure out if there should be any parenting time. Are you going to comply with that?

. . . .

THE COURT: All right, I'll put it to you this way, I'm going to order it as part of the disposition of this, but the reality is if you don't comply with it you're not going to be able to get visitation.

[RAE]: Okay, Your Honor.

THE COURT: That's the point. I'm trying to avoid that from happening, but you keep resisting me. So it's either we're going to do the things that need to be done or the visitation is going to remain not happening. And obviously your daughters very much would like to see you, you've indicated you would like to see them. And once again, as far as the criminal proceedings if we

34

have a protocol here more often than not they will permit some limitation on their restraints so that you can see them in accordance with the visitation plan. But you have to do what you have to do. So, you're going to do it or you're not. I just can't keep going around in circles.

The judge entered a dispositional order on October 21, 2021, continuing legal custody of Ruby and Elle with Rae and Len, and physical custody with Len. The judge further ordered Rae's "visitation for both children shall be suspended until the criminal no[-]contact provision can be address[ed]."[14] We have no record of the disposition of the criminal complaint against Rae.

Between January 25, 2022 and July 19, 2022, two different judges presided over three compliance review hearings and the subsequent dismissal of the Title Nine action.[15] Judge Suh presided over the January 25, 2022 hearing wherein the Division advised that Rae was essentially non-responsive and non-compliant with its recommendations and had failed to appear for a December

---

[14] In July 2021, prior to the end of the fact-finding hearing, Rae was arrested and criminally charged for burning Elle and a Criminal Part judge issued a no-contact order prohibiting Rae from having any contact with Elle.

[15] Judge Haekyoung Suh presided over the January 25, 2022 and May 10, 2022 compliance review hearings, and Judge Bernadette N. DeCastro presided over the July 19, 2022 hearing and on September 12, 2022 entered an order dismissing the Title Nine action.

35

15, 2021 evaluation. Specifically, the Division highlighted Rae's failure to complete a budget, provide a work schedule, advise of her current housing, and to make herself available "to meet with [Division staff] on a monthly basis to address services, . . . [and] to go over the contents of [its] records." Judge Suh maintained Judge Marino's October 21, 2021 dispositional order in full force and effect.

At the May 10, 2022 compliance review hearing, Rae filed what she described as a motion to vacate the court's January 25, 2022 order. In opposing this motion, Gail's counsel stated, "that's not a legal document . . . That document had no purpose other than to harass [the Division], all of the co-litigants in this case, and all of the attorneys in this case. That conduct is also not consistent . . . with the rules of the Court." Elle's Law Guardian also expressed concern with Rae's application, stating "I am concerned with regard to the application, because it hardly complied with appropriate format for a motion to vacate the January 25th court order, because the provisions she seeks relief from were actually ordered on October 18th, 2021."

Before addressing Rae's motion, Judge Suh expressed the need to conduct a best interest hearing, stating:

> The court report indicates that neither [Elle] nor [Ruby]
> is expressing any safety concerns in the custody and

care of their father. Both children are receiving a number of services to stabilize them, and it appears that they are also doing well.

As such, the [c]ourt is going to set this matter down for a best interest hearing, because we cannot close the case without same. The request to modify the existing [FM] order under -- for custody and parenting time, that can only be done after the conclusion of a best interest hearing. Thus, the [c]ourt will schedule same immediately.

Judge Suh continued the order barring Rae from parenting time with Elle and further ordered that

visitation for both children shall remain suspended until the criminal no[-]contact provision can be address. The position of the children's individual therapists remains that visitation for [Ruby] and [Elle] with [Rae] should not occur until both children are able to visit together and until [Rae] has demonstrated compliance with her court ordered services. If in the future, [Ruby's] therapist recommends parenting time with [Rae], without [Elle], and [Ruby] is in agreement with same, a therapeutic plan shall be written by the therapist and provided to the court and counsel for consideration.

On July 19, 2022, the Division requested dismissal of the Title Nine litigation with the then-current restraints on Rae's contact with the children, citing Rae's lack of engagement in court-ordered services over an extended period. At the beginning of the hearing, the Division advised Judge DeCastro of the parties' "discussion regarding best interest and potential resolution" of the

37

case during the May 10, 2022 hearing. Judge DeCastro advised counsel that it was not her practice to conduct a best interest hearing without a defendant making a written request for one.

Rae objected to terminating the Title Nine litigation with the current restraints on custody and visitation remaining in place. The judge informed Rae that she could file a motion for a best interest hearing within fourteen days, noting that the motion "should provide what you want the [c]ourt to do and what you're going to seek to prove, [and] who you're going to present as a witness." The judge also advised Rae that if she did not file the appropriate motion, the Division's application to dismiss the Title Nine action would be granted and the restraints on her parenting time would be continued.

There is no evidence in the record establishing that Rae filed a motion for a best interest hearing. Instead, Rae emailed counsel and the court an undated letter which referenced "an email sent on July 19, 2022 to all [c]ounsel representing parties in the above matter objecting to the verbiage of the [five]-page [c]ourt order." The record includes a reply email, dated August 10, 2022, from court staff advising Rae that her submission was deficient because the attachment was illegible.

On September 12, 2022, at the Division's request, Judge DeCastro

dismissed the Title Nine litigation. The dismissal order entered by the judge retained legal custody of the Ruby and Elle with Len and Rae but awarded only Len physical custody.[16]

Rae then moved for reconsideration of the dismissal order and the August 10, 2021 fact-finding order.[17] On October 3, 2022 the court denied Rae's motion for "procedural reasons as well as jurisdictional deficiencies" and directed that "any further proceedings that have to do with the custody of the children should be under the applicable FD, FV or FM Dockets."

On October 27, 2022, Rae appealed the September 12, 2022 order dismissing the action, the August 10, 2021 order finding that she had abused and neglected Elle, and the October 3, 2022 order denying her motion for reconsideration. Rae moved for summary disposition and remand on March 28, 2023, seeking a new trial and a new dispositional order. The court denied the

---

[16] Rae's parenting time with Elle also remained suspended pursuant to the active criminal no-contact order and her parenting time with Ruby was suspended "under the FN docket as neither [Ruby's] therapist or [Elle's] therapist recommended that [Rae's] parenting time with [Ruby] resume until therapeutically recommended and [Rae] engage in services."

[17] Rae's motion for reconsideration does not appear in the record. However, the court's decision states that this motion seeking relief from several orders "purports to be filed pursuant to Rules 14:50-1(c), (e). and (f), and 1:10-1." The court noted in its October 3, 2022 decision that rule "14:50-1," cited by Rae, does not exist.

motion on April 24, 2023.

III.

On appeal, Rae argues the following points:

POINT I

Regardless of this Court's conclusion as to the issue of abuse and neglect, the matter must be remanded for further proceedings because the final order was entered without a G.M. [18] hearing and its terms are unlawful.

A. The final order is not authorized by Title [Nine].

B. The litigation was dismissed without the required G.M. hearing prior to the litigation's termination.

POINT II

The conduct of the Title [Nine] trial was fundamentally flawed, denying due process to the mother and undermining the reliability of the outcome, such that a new trial must be ordered.

A. The mother had not seen discovery and did not have the majority of the exhibits when trial began on March 22, 2021.

B. The mother was not allowed to present her defense in her own way which is at the core of the right of self-representation.

C. The fairness of the trial was impugned by technical issues.

---

[18] N.J. Div. of Youth & Fam. Servs. v. G.M., 198 N.J. 382 (2009).

40

D. Standby counsel's performance was so deficient that the "safety net" failed and [the Division's] evidence was not tested in an adversarial proceeding.

POINT III

The evidence was insufficient to establish abuse where the child's out-of-court statements were inconsistent, unreliable and uncorroborated as to who inflicted the burns, and no evidence was presented to establish the family was able to secure medical treatment to minimize scarring.

A. The child's out-of-court statements were inherently unreliable and the judge erred by not resolving the factual disputes on the basis of competent and reliable evidence.

B. The child's out-of-court statements about who burned her were not corroborated by other admissible evidence.

C. [The Division's] evidence was insufficient to establish medical neglect which requires proof that the parent was financially able to secure care.

On appeal, Rae challenges the court's orders pertaining to the fact-finding hearing, the dispositional hearing, the compliance review hearing, and the termination of the Title Nine proceeding. In addressing Rae's arguments, we first examine the fact-finding hearing, then address the post-fact-finding hearings, and, last, consider the dismissal of the litigation.

41

Rae argues that the fact-finding hearing was fundamentally flawed because the court permitted her to represent herself and allowed the proceedings to continue without granting her an opportunity to have full discovery of the Division's records.[19] Rae also argues that she was not permitted to "shape her own testimony and defense[,]" that the "fairness of the trial was impugned by technical issues[,]" and that standby counsel's performance was "so deficient that the 'safety net' failed and [the Division's] evidence was not tested in an adversarial proceeding."

## IV.

We first address Rae's argument that the court erred by allowing her to represent herself. Our review of a trial judge's grant or denial of a parent's request to represent herself in a Title Nine action is de novo, giving "no deference to the [judge']s legal determination as to the scope of the right." N.J. Div. of Child Prot. & Permanency v. R.L.M., 236 N.J. 123, 152 (2018).

---

[19] On appeal, Rae argues that of the two experts scheduled to testify during the hearing, she had never seen one of the expert's reports and had only seen portions of the other expert's report. Rae does not specify which report she had seen, however, in her brief, Rae argues that her then-counsel confirmed that she had only shown Rae "some portions of some of the exhibits and had withheld Elle's psychological evaluation." During the hearing, Rae failed to identify what Division records she had sought, but she repeatedly asked the court for "full discovery."

A-0632-22

Prior to the start of the fact-finding hearing, the judge stated, "[i]f you want to represent yourself, I will certainly voir dire you. I will make that decision. But we are going forward today. So, if you're not prepared to go forward today then perhaps you want to reconsider your request." The judge inquired whether Rae understood the proceedings and was aware of the disadvantages of foregoing representation by her previously appointed counsel. Rae confirmed she understood, replying "I understand that, Your Honor."

The court asked Rae whether she had "any knowledge of the rules of evidence or procedure in this matter." Rae's response was "[w]ell, Your Honor, I mean, I do—I do." Rae then proceeded to ask the court a question about how she should testify if she did not remember anything from 2013 to 2014, and the court sought to clarify that there is a difference in testifying as a party and appearing in the case as a self-represented litigant. The court explained the different roles of attorneys and stated, "[y]ou are representing your interests, but that would be as in cross[-]examination, making appropriate objections, and moving in appropriate evidence." Rae responded, "[o]kay, Your Honor. All that I—I do understand."

Having determined that Rae clearly and unequivocally asserted her right to self-representation, the judge concluded that Rae "understands the litigation

we're in, understands the point of it" and stated "certainly people still have a right to press forward with that request."  The judge further noted that she did not find any reason or problem with Rae representing herself.  Thereafter, the judge appointed Rae's then-counsel as standby counsel, tasking standby counsel with the responsibility to aid Rae and to ensure the proper use of confidentiality records.

We find R.L.M. instructive on this issue.  In R.L.M., the Court prescribed a set of guidelines for Family Part judges to consider when addressing a parent's request to proceed without counsel, or with standby counsel.  Id. at 149.  First, the parent must assert their right "in a timely manner."  Ibid.  Second, the parent must invoke their right of self-representation "clearly and unequivocally" on the record and their waiver must be made "knowingly, intelligently, and voluntarily."  Ibid.  Third, the judge may appoint standby counsel in their discretion, although they need not do so.  Id. at 150.  Fourth, if the parent "declines to follow the court's instructions, disrespects the court or any participant in the hearing, or refuses to take part in the proceedings," the judge may "take appropriate steps" to reach an outcome that is in the child's best interests.  Id. at 151.  "No decision by a parent to proceed unrepresented should be permitted to impede a just and expeditious outcome for the child."  Ibid.

Paramount to a judge's consideration of a litigant's request to proceed without counsel in an abuse or neglect proceeding is the child's best interest. Id. at 151. Also, a judge must be assured that the parent understands the seriousness and difficulty of appearing without counsel. Id. at 132. And where a competent parent "clearly and unequivocally" requests to represent themselves, a judge "should engage in [an] abbreviated yet meaningful colloquy" in order to become "satisfied that the parent understands the nature of the termination of rights proceeding and the disadvantages of self-representation." Ibid.

Applying these guiding principles, we are persuaded that Judge Marino engaged in a meaningful colloquy with Rae to address the essential factors enunciated in R.L.M. and to ensure that Rae understood the seriousness and gravity of the fact-finding hearing and the difficulty of appearing without counsel, and made a knowing and intelligent waiver of her right to represent herself. We also consider that Rae advised her then-counsel that she wanted to represent herself a mere three days prior to the start of the fact-finding hearing and the court addressed this issue at its earliest opportunity: on the first scheduled hearing date.

Based on this record, we are satisfied the judge addressed the relevant factors and properly concluded that Rae understood the gravity of her request to

represent herself, the nature of the termination of rights proceeding, and the disadvantages of self-representation. Moreover, the judge took the additional step of appointing Rae's then-counsel as standby counsel, and in so doing, Rae had the benefit of counsel who was intimately familiar with the case. Because we are persuaded the judge correctly followed and applied the guidelines as enunciated in R.L.M., we conclude there is no basis to disturb the judge's decision permitting Rae to represent herself.

Similarly, we discern no abuse of discretion in the judge's denial of Rae's oral application for an adjournment of the fact-finding hearing. See R.L.M., 236 N.J. at 149 (stating the right to self-representation does not include the right to delay the proceedings, especially when a child's status hangs in the balance). In making this determination, we also consider that although the Division's complaint against Rae and Len was filed in 2020, the allegations of abuse stem from Rae and Len's actions that had taken place more than six or seven years earlier when Elle was five or six years old. Given the passage of that time, we perceive no error in the judge's denial of Rae's belated request for an adjournment, especially given that the best interest of Ruby and Elle was at issue. In R.L.M., the Court emphasized that "[g]iven the impact of a trial delay or interruption on a child Family Part judges conducting termination of parental

rights proceedings must be mindful of the need for prompt determination of the difficult issues before them." R.L.M., 236 N.J. at 146-47. Thus, given the allegations against Rae and the impact any further delay in the proceedings may have had on the minor children, we discern no abuse of discretion in the court's denial of Rae's belated request for an adjournment and the judge's decision to proceed with the fact-finding hearing.

V.

We next turn to Rae's arguments that she was not afforded access to complete discovery prior to the start of the fact-finding hearing and throughout the proceedings, and that she was therefore denied the right to meaningful self-representation because the court did not permit her to "shape her own defense."

The Division emphasized that it had scheduled a date and time for Rae to come to its office to view discovery and that she had declined to avail herself of that opportunity. Those facts were confirmed on the second day of the fact-finding hearing:

> [DIVISION COUNSEL]: I emailed [Rae] on Wednesday the 31st in the afternoon offering either Thursday the 1st or Monday the 5th. I received no response. Another e-mail was sent again yesterday on the 5th, indicating that she needs to provide her availability. I cannot do it on short notice. It needs to go through Staffing to ensure that there are an appropriate number of people in the building . . . . I am

more than willing to work with [Rae], however, to date I have received no further dates on which she is available to come in.

THE COURT: [Rae], do you have some dates that you can give [counsel] now?

[RAE]: Your Honor, I don't feel comfortable with not being able to have someone with me because I don't want false, you know, allegations that I'm doing this or I'm doing that—

THE COURT: Well, you can't have anybody with you, so that's just not happening.

. . . .

You can't have another person for many reasons. First of all because of the confidential nature. Second, because of COVID there's still a restriction on how many people they can even have in their office . . . . There's no reason you can go there, look through the evidence and I can't anticipate what any problem could be and what allegations are going to be made. You obviously can't take pictures of things. You can't make copies of things — and whatever the other rules are.

Rule 5:12-3 requires the Division to provide reports of experts or other documents upon which it intends to rely "to the court, to counsel for all parties, and to any self-represented party on the first return date of the Order to Show Cause." However, access to Division records is not unfettered. N.J. Div. of Child Prot. & Permanency v. K.G., 460 N.J. Super. 467, 476 (App. Div. 2019).

In K.G. we addressed the need to protect the statutory confidentiality of Division records.[20] We also recognized that proceedings involving abuse or neglect will necessarily involve the disclosure to defendant's counsel of confidential notes from the child victim's therapy sessions. Id. at 476. We concluded that concerns about the confidentiality of Division records should be addressed by considering various available measures to "safeguard the goals of the State to uncover and treat abuse and neglect, and to protect victim children, without unnecessarily sacrificing a parent's right to exercise a desired choice of legal counsel." Id. at 477 (quoting N.J. Div. of Youth & Fam. Servs. v. N.S., 412 N.J. Super. 593, 640 (App. Div. 2010)).

Here, there is no dispute that on the first day of the fact-finding hearing Rae had not received or reviewed the entirety of the Division's experts' reports from Drs. Medina and Gonzalez-Cruz. Rae's standby counsel stated on the record that she had "provided all the evidence that [she] had in [her] possession to the Division so [Rae] could go there and access them" and that she was "available to answer any questions" about the issues in the case.

---

[20] Under N.J.S.A. 9:6-8.10a(1)(a), "[a]ll records of child abuse reports . . ., all information obtained by the Department of Children and Families in investigating such reports . . ., and all reports of findings forwarded to the child abuse registry . . . shall be kept confidential and may be disclosed only under the circumstances expressly authorized . . . herein."

The record also shows that the judge addressed Rae's request for discovery, including her request for access to confidential Division records while maintaining the required confidentiality of reports pertaining to Ruby and Elle. The court addressed Rae's concerns that she did not have copies of all Division records and that she had been advised the Division's records had been made available for her to review, not copy, at the Division's office. There is no dispute that such an offer had been made to Rae and that she refused it.

Under these circumstances, we reject Rae's argument that the court erred by not ensuring that she had a fair opportunity to review the Division's records, including the psychological and medical evaluations of her children. Rae's position on this issue is clear—as she repeatedly stated on the record—she did not avail herself of the opportunity to view the records in person at the Division's office because of her belief that she was entitled to have copies of the records. Further, we conclude that Rae's argument that she did not want to go to the Division's office to review the records because of her concern that she would be accused of misbehaving is a poor and wholly invalid excuse. Rather, she opted not to avail herself of the opportunity to review the records in person, as inexplicable as that may be, when an opportunity had been made available to

50

her. Thus, it was Rae's choice, and not the judge's actions, that deprived her of her opportunity to review the records.

Moreover, not only did Rae fail to take advantage of the opportunity to view the Division records prior to the fact-finding hearing, but following the start of the hearing and having heard the testimony of the Division's experts, Rae had the opportunity to review the report of Dr. Gonzalez-Cruz with standby counsel. The court permitted Rae to undertake this review prior to the report being admitted in evidence. The judge's actions reflect an earnest effort to address Rae's concerns about the need to review discovery to aid in her defense. Therefore, Rae has not demonstrated that the court's decision to proceed with the fact-finding deprived her of an opportunity to review the confidential records resulted in any prejudice to her.

Additionally, we note that Rae has failed to establish that granting her belated request for an adjournment of the fact-finding hearing, even if for the purpose of allowing additional time, would have aided her defense, provided exculpatory evidence or information, or altered her cross-examination. Thus, we are not convinced that Rae was denied a meaningful opportunity to represent herself by not having access to confidential Division reports and records prior to the fact-finding hearing. The records had been made available, consistent

51

with the law intending to maintain their confidentiality and given the valid concerns articulated by counsel—that Rae had previously shared confidential information with third parties not involved in the case.

## VI.

We next turn to Rae's argument that the court should have allowed her "to testify as she chose" and that the "failure to accept any of Rae's witness proffers, as clumsily as they may have been drafted, also prevented [her] from shaping her own defense." More particularly, Rae asserts that "the judge limited the parameters of her testimony by asking questions and often cut[] off [her] answers," failed to allow her to make her own statement, and, did not allow her to call Elle's CMO counselor. Rae argues Elle's CMO counselor's testimony would have been relevant because the CMO counselor had disclosed to the Division that Elle was "sneaky and manipulative" and that the CMO counselor was suspicious that the information that Rae had caused Elle's burns was suddenly being revealed in the midst of a contentious divorce. Rae maintains that the CMO counselor and other therapists' testimony "might well have shed light on Elle's trustworthiness or motivations for pointing the finger at Rae after so many years."

52

On the final day of the hearing, Rae disclosed that she had been incarcerated and wanted some time to speak with the attorney who was representing her in the criminal matter. The judge contacted the attorney via phone and permitted Rae to speak with him prior to the start of her testimony. The judge reminded Rae that she had standby counsel available to assist her and advised that the court would not stop the fact-finding hearing because it was almost at its end. The judge explained, "I think it would be way too prejudicial to everybody else involved and, most importantly, to the child involved, so I'm not going to do that."

Our Rules of Evidence provide the mode and order of interrogation and presentation of evidence:

> (a) Control by Court; Purposes. The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence to:
>
> (1) make those procedures effective for determining the truth;
>
> (2) avoid wasting time; and
>
> (3) protect witnesses from harassment or undue embarrassment.
>
> [N.J.R.E. 611.]

Rae's argument that she should have been allowed to testify as she chose is unavailing and meritless. N.J.R.E. 611(a) states that the court "shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence." Cases involving pro se litigants are no exception to that Rule. Further, pro se litigants like Rae are held to the same rules as attorneys. Tuckey v. Harleysville Ins. Co., 236 N.J. Super. 221. 224 (App. Div. 1989) ("Litigants are free to represent themselves if they so choose, but in exercising that choice they must understand that they are required to follow accepted rules of procedure promulgated by the Supreme Court to guarantee and orderly process.")

Given the responsibility of judges to exercise reasonable control over court proceedings for the express purpose of ensuring effective procedures for determining the truth and to avoid wasting time, we are not convinced the judge should have allowed Rae to testify as she wished. Her argument to the contrary is wholly meritless.

Moreover, regarding Rae's contention that the court did not permit her to call witnesses, the record does not show that Rae had properly notified the court or counsel of witnesses she intended to call. Rae had submitted a list of names of witnesses to the court, however, she consistently failed to provide a proffer

describing the anticipated testimony of her putative witnesses. Rae also failed to adhere to the court's instructions that she provide a summary of their anticipated testimony. Further, Rae acknowledges her submitted witness proffers were "clumsily made" thereby defeating her own argument. We conclude Rae's acknowledged failure to comply with the judge's instructions resulted in her inability to call the witnesses she claims she would have called. The judges' decision was rational and reasonable and, thus, we discern no abuse of discretion in denying Rae's request to adjourn the final day of the fact-finding hearing to permit Rae to call witnesses she had failed to properly identify.

## VII.

Next, we turn to Rae's argument that her standby counsel failed to provide an adequate "safety net." Specifically, Rae argues that as of the first day of the hearing, the Division had not provided her with the experts' reports and trial exhibits either through her assigned counsel—prior to the judge granting her application to represent herself—by the Division, or by standby counsel appointed that morning, and that she had not been given the opportunity to go to the Division's office to view the reports prior to the start of the hearing.

We note that much of Rae's argument regarding standby counsel is intertwined with her argument regarding her access to the expert reports. Rae

further argues that standby counsel failed to assist her in viewing expert reports and that failure impinged on her ability to effectively cross-examine Drs. Medina and Gonzalez-Cruz. Rae's arguments ignore the fact that she was afforded multiple opportunities to review the confidential reports in this case at the Division's office and that she could have done so with her then-counsel and standby counsel.

We acknowledge, that in denying Rae's request for an adjournment on the first day of the fact-finding hearing, in part because the Division had scheduled Dr. Medina, its expert in child abuse pediatrics, to testify on that date, Rae would not have had the opportunity to cross-examine Dr. Medina after having the benefit of a thorough review of the doctor's report. However, our review of the record shows that Rae's cross-examination proved efficient as she was able to elicit from Dr. Medina that she had only one visit with Elle, and that Elle had given different versions of how the injury occurred.

We also consider significant that during the cross-examination of Dr. Medina, the judge permitted Rae to consult with standby counsel and that she availed herself of that opportunity prior to continuing her cross-examination. Moreover, nothing prevented Rae from asking the court to recall Dr. Medina between the first and second hearing dates and to view the Division's records

during the recess or non-hearing dates—the fact-finding hearing took place over the course of five mostly non-consecutive dates—but once again, Rae did not.

On the second day of the fact-finding hearing, standby counsel stated that she had "provided all the evidence that [she] had in [her] possession to the Division so [Rae] could go there and access them" and that she was "available to answer any questions . . .[b]ut it has to be definitive to the issues in the case." The judge again advised Rae that the role of standby counsel is "passive" and limited to assistance with fact-finding issues. The following colloquy between Rae and the court underscored this point:

> THE COURT: Well, you had a date to go, you chose not to go.
>
> [RAE]: No, it's not that I didn't choose, it's that -- it's not that I didn't choose, Your Honor, I didn't have the capability of going because I was under the impression that [standby counsel] was going to meet me there. –
>
> . . . .
>
> THE COURT: She sent you an e-mail, though, explaining that you did not need her, you could go and that they were all set up and ready for you. And I think something came from the Division as well.

In response the Division stated:

> Thank you, Your Honor. I emailed [Rae] on Wednesday the 31st in the afternoon offering either Thursday the 1st or Monday the 5th. I received no response. Another

e-mail was sent again yesterday on the 5th, indicating that she needs to provide her availability. I cannot do it on short notice. It needs to go through Staffing to ensure that there are an appropriate number of people in the building. We don't have individuals readily available to accommodate. I am more than willing to work with [Rae], however, to date I have received no further dates on which she is available to come in.

The record shows that the court, standby counsel, and the Division all sought to address Rae's request for additional discovery, mostly by making Division records available at the Division's office. However, in view of the undisputed fact that Rae had, on prior occasions, improperly disclosed confidential information about the case to counsel other than her own, it was reasonable for standby counsel and the Division to designate a specific time and place for Rae to view the expert reports. The record shows standby counsel's efforts to assist Rae throughout the proceeding, but again Rae's own actions and inactions hampered her presentation of the evidence—Rae chose not to go to the Division office to review the confidential records—, and it was up to Rae to utilize the services of counsel as much or as little as she deemed appropriate. The record of the fact-finding hearing shows that standby counsel was present, and nothing in the record supports Rae's contention that counsel was unresponsive to Rae's needs. Thus, Rae's argument that standby counsel appointed by the court failed to be an adequate safety-net is unavailing.

We also reject Rae's argument that technical problems impugned the fairness of the fact-finding hearing. It is axiomatic that the Due Process Clause of the United States Constitution and the New Jersey Constitution requires the States to afford certain civil litigants "an opportunity to be heard at a meaningful time and in a meaningful manner" by removing obstacles to their full participation in judicial proceedings. Doe v. Poritz, 142 N.J. 1, 106 (1995) (quoting Kahn v. U.S., 753 F.2d 1208, 1218 (3d Cir.1987)). Due process is not a fixed concept, however, but a flexible one that depends on the particular circumstances. Id. (quoting Zinermon v. Burch, 494 U.S. 113, 127 (1990)). Due to the widespread use of virtual court proceedings today, courts must take appropriate precautions to detect and correct technological issues in order to maintain the integrity of the proceedings. See State v. Vega-Larregui, 246 N.J. 94, 133 (2021).

We recognize that there were a number of technical challenges during the fact-finding hearing conducted via Zoom as necessitated by the COVID-19 Pandemic, including at the start of the November 17, 2020 hearing. However, the record also shows that the technical issues were timely addressed and resolved by the judge and court staff.

Throughout the proceedings, the judge ensured that Rae could hear the

59

testimony of the witnesses, make timely objections, and understood the nature of the proceedings, adjourning the hearing when necessary, including on April 6, when the court adjourned the hearing because of technical issues that arose during Rae's cross-examination of Detective McCarthy. In addressing this issue, the judge adjourned the hearing and instructed court staff to set up computer equipment for Rae in the courtroom on the next hearing date, however, Rae chose to appear remotely instead.

Rae also failed to support this argument by showing that any technical difficulties that arose during the fact-finding hearing affected her ability to represent herself, to participate in the hearing, or affected the legal determination made by the court. Absent a showing by Rae that any of the technical problems affected the outcome of the trial or prejudiced her in any way, we are not persuaded that the court violated Rae's due process rights because the court conducted the proceedings via Zoom and there were periodic technical issues.

Rae also challenges the sufficiency of the evidence relied upon by the court in its finding that she abused or neglected Elle, including the court's reliance on Elle's out-of-court statements. Rae argues that Elle's out-of-court statements made during the Division's investigation were inconsistent,

unreliable, and uncorroborated as to who inflicted the burns and why the family was purportedly unable to secure medical treatment to minimize scarring to Elle's feet.

"In general, 'Title [Nine] controls the adjudication of abuse and neglect cases.'" Dep't of Child. & Fams., Div. of Child Prot. & Permanency v. E.D.O., 223 N.J. 166, 177 (2015) (quoting N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 343 (2010)).  Title Nine defines an "abused or neglected child" as one under the age of 18 whose:

> physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian . . . to exercise a minimum degree of care . . . in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment . . . .
>
> [N.J.S.A. 9:6-8.21(c)(4)(b).]

"Abuse and neglect cases are generally fact sensitive." N.J. Div. of Youth & Fam. Servs. v. P.W.R., 205 N.J. 17, 33 (2011).  As our Supreme Court has recognized, cases adjudicating such claims by the Division require "careful, individual scrutiny."  Ibid.  The quantum of proof required in a fact-finding hearing brought under Title Nine is well established.  The Division must prove

its allegations by a preponderance of the evidence at a fact-finding hearing. N.J.S.A. 9:6-8.46(b)(1).

In these matters, our standard of review is "strictly limited." N.J. Div. of Youth & Fam. Servs. v. I.H.C., 415 N.J. Super. 551, 577 (App. Div. 2010). We are bound to accept the trial court's factual findings so long as they are supported by sufficient credible evidence. N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012). "[A]ppellate courts 'defer to the factual findings of the trial court because it has the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; it has a feel of the case that can never be realized by a review of the cold record.'" M.C. III, 201 N.J. at 342-43 (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008)). Moreover, "[b]ecause of the family courts' special jurisdiction and expertise in family matters, appellate courts should accord deference to family court fact-finding." Cesare v. Cesare, 154 N.J. 394, 413 (1998). We owe no deference, however, to the judge's legal conclusions. N.J. Div. of Youth & Fam. Servs. v. I.S., 202 N.J. 145, 183 (2010).

As a preliminary matter, we note that Rae does not dispute that Elle suffered burns to her foot or feet at some time during childhood while Elle was in Rae and Len's care. Rae takes exception, however, to the court's reliance on

Elle's out-of-court statements—made to the Division's investigators years after the incident—that placed the blame squarely on her, arguing that Elle's memory would have been distorted by the passage of time and was unreliable and uncorroborated.  She also argues that "the issue of who inflicted the burns and why turned entirely on Elle's changing statements and the only way to resolve the factual disputes was for the judge to have [Elle] testify or engage her in an in[-]camera interview."  Rae also claims that while Dr. Medina's testimony corroborated the fact that Elle was burned, it did not corroborate Elle's statements that it was Rae who had burned her.

The Division contends that the credible evidence adduced at trial demonstrated that Rae scalded Elle's feet in the bathtub of steaming water as a form of punishment, and failed to promptly seek medical attention, causing second-degree burns and permanent scarring.  The Law Guardian similarly contends that the preponderance of the evidence clearly established that Rae intentionally submerged Elle's feet in a steaming tub of water as a punishment, causing her excruciating pain, second- or third-degree burns, risk of infection, and "protracted disfigurement" in the form of scarring of her feet, satisfying N.J.S.A. 9:6-8.21(c)(1) and (c)(4)(b).

The court relied on:  the testimony of Division witnesses, including

A-0632-22

experts Dr. Medina and Dr. Gonzalez-Cruz; three Division investigation summaries from November 14, 2017, July 29, 2019, and July 2, 2020; photographs of Elle's feet depicting raised, keloid scarring; a medical assessment of Elle; Elle's psychological evaluation; and a Hillsborough police report. Dr. Medina testified that the scarring pattern, which was circumferential, and the lack of injury to the soles of Elle's feet was consistent with Elle's account that Rae had placed her in the bathtub and forced her to stand in the hot water. Dr. Gonzalez-Cruz similarly testified that Elle had provided her with the same two stories about the incident and the origin of her scarring. And, the testimony of each of the Division caseworkers corroborated Elle's statements made during the July 29, 2019 and July 2, 2020 interviews.

The court found the Division's witnesses testified credibly and the evidence in the record established that between 2013 and 2016 Rae physically abused Elle by forcing her to put her feet in a bathtub of scalding hot water as punishment for taking a cookie without Rae's permission, and that Rae failed to seek immediate medical care for Elle and as a result, Elle sustained severe second-degree burns. As to why the judge did not conduct a child interview of Elle, the judge explained the decision was to avoid "yet another traumatic and stressful situation to cause [Elle] to have to come and talk to the judge and to be

64

worried about consequences when she has told the consistent story to two experts and a number of Division workers."

Here, Elle made statements to Division caseworkers and its experts, and the court concluded that her statements about the two versions of the story about what happened to her feet were consistent with the physical evidence of her burns and, thus, corroborated by the experts' testimony. Contrary to Rae's assertions, the court did not err in considering and relying on Elle's statements to Division investigators and experts that it was Rae who placed her in the bathtub of hot water as proof of abuse or neglect. We agree that because Elle did not testify at trial, N.J.S.A. 9:6-8.46(a)(4) requires that her previous statements be corroborated. "The most effective types of corroborative evidence may be eyewitness testimony, a confession, an admission or medical or scientific evidence. However, corroborative evidence 'need not relate directly to the accused and by its nature need only provide support for the out of court statements.'" N.J. Div. of Youth & Fam. Servs. v. L.A., 357 N.J. Super. 155, 166 (App. Div. 2003) (quoting N.J. Div. of Youth & Fam. Servs. v. Z.P.R., 351 N.J. Super. 427, 436 (App. Div. 2002)).

Here, the court concluded that Elle's statements attributing her burn injuries to Rae were corroborated by the clear and unequivocal medical evidence

offered by Dr. Medina about the circumferential pattern of the burn scars on her feet. The court further concluded that none of the explanations provided by Rae regarding the cause of Elle's injuries were consistent with the injuries, and Rae's account of the incident was "extraordinarily evasive" and "replete with contradictions." We agree.

In our review of the record, we note that Rae testified that she could not recall when she became aware that Elle's feet had been burned but believed that Len had placed Elle in the shower. She stated that she called Len when she walked into the bathroom and saw Elle standing alone in the bathroom, not crying, but with both of her feet appearing red. She also testified that when Len arrived home, she suggested taking Elle to the doctor, but he refused because "she has an immigration problem" and "he didn't want his family to find out." Rae further testified that Len did not allow her to see Elle or tend to her injuries for two or three days, and despite the obviously serious burns that she had expressed concern about, Rae had vague and confusing recollections about whether she had taken Elle to a doctor, the doctor's name, and the timing of any medical visits for the burn injuries.

Ironically, we note that Rae also had various versions of how Elle's feet were burned—the very same argument she makes about Elle. Rae testified it

A-0632-22

was Len who gave their daughters showers, inexplicably suggesting it was a cultural norm, while also stating that she was a stay-at-home mother primarily responsible for the children and she bathed the girls together in the bathtub, apparently except for the day in question. Regarding the day of the incident, Rae testified that Len was in-and-out of the home and that he burned Elle's feet when he gave her a shower, but then testified that she did not know how Elle was injured because Rae was out and she had to call him on his cell phone to tell him about Elle's burns. She also testified that she saw Elle standing in the bathroom and her feet were red, but that she did not know what caused the redness and that she called Len. Rae also admitted that Len intentionally kept her away from Elle after the injury; the implication being that Len had blamed Rae for Elle's injuries. Finally, Rae claimed that she took Elle to a doctor who said her feet looked "fine," though Rae could not recall the doctor's name or when that visit occurred.

Based on this record, we are convinced Rae is a poor historian given her own varied versions of the cause of Elle's injuries—and the judge considered as much before concluding her testimony was inconsistent, evasive, and not credible. We therefore accept the judge's factual findings because they are supported by sufficient credible evidence as we have reviewed in detail above.

A-0632-22

Further, given our strictly limited standard of review, we discern no basis to disturb the Family Part judge's fact-findings of abuse or neglect by Rae. F.M., 211 N.J. at 444.

## VIII.

We next address Rae's argument that the court exceeded its authority under Title Nine by terminating the litigation with continued restraints on Rae's contact with both children in violation of N.J.S.A. 9:6-8.54, and that even if the October 18, 2021 hearing could be considered a dispositional hearing, "there is nothing in the record that demonstrates that Rae was on notice that this was her opportunity for a hearing on the issue of whether it was safe to return the girls to her physical custody . . . . " Rae further argues that she was not provided with an opportunity to cross-examine the therapists whose reports the Division and the court relied on at the October 18, 2021 hearing, or at any of the compliance review hearings thereafter, and the court entertained only attorney representations and hearsay diagnoses and opinions embedded in the reports of professionals, who were not made available for cross-examination.

Gail, Elle's biological parent, states in her appellate brief that she, "respectfully requests that this court remand this matter for further proceedings so that the trial court may enter an order permitting [her] visitation with, or

shared custody of Elle." And, further that "as a biological parent to Elle, she was entitled to such a hearing," even without seeking a hearing because "the trial court was well aware of [her] position, and yet terminated the litigation without addressing" her rights to custody and visitation with Elle.

This record is clear, however, that Gail did not assert any rights to custody or parenting time with Elle during the proceedings before the Family Part. Gail did not testify at any of the fact-finding hearings, and she raised these issues in her responsive brief on appeal. Having failed to file a cross-appeal for custody or parenting time under Rule 2:3-4, or to petition the Family Part for custody and parenting time of Elle, we reject Gail's arguments presented on appeal. Neider v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973). ("It is a well-settled principle that our appellate courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available 'unless the questions so raised on appeal go to the jurisdiction of the trial court or concern matters of great public interest.'") (quoting Reynolds Offset Co., Inc. v. Summer, 58 N.J. Super. 542, 548 (App. Div. 1959)).

The Division maintains that the court held the required dispositional hearing "to determine what order should be made" after the fact-finding hearing

and entered an order releasing the children to Len's custody under N.J.S.A. 9:6-8.53 and suspending visitation between Rae, Ruby and Elle until the criminal no-contact provision could be addressed and the children's therapists recommended resuming supervised visits. The Division also maintains that Rae failed to grasp that her circumstances and refusal to engage with essential services as recommended by the Division impeded her contact with the children and ultimately led to the order entered by the court terminating the litigation with continued restraints.

In Title Nine cases, after entering a finding of abuse or neglect, the parties are entitled to a dispositional hearing to determine an appropriate custody arrangement, and if not, what the proper disposition should be. N.J.S.A. 9:6-8.51(a). Among the relief available, the court may enter dispositional orders: "requiring that an individual found to have abused or neglected a child accept therapeutic services," N.J.S.A. 9:6-8.51; "release the child to the custody of the parent or guardian responsible for the child's care at the time of the filing of the complaint," N.J.S.A. 9:6-8.53; or "place the child in the custody of a relative or other suitable person or the Division" N.J.S.A. 9:6-8.54. G.M., 198 N.J. at 397-8.

In G.M., the Court held that "the statutory framework of Title Nine provides that upon a finding of abuse and neglect, the offending parent or guardian is entitled to a dispositional hearing to determine whether the children may safely return to his or her custody, and if not, what the proper disposition should be." 198 N.J. at 387-88. The Court in G.M. explained that a dispositional hearing "must be held to determine the appropriate outcome of the case." Id. at 399.

In G.M., a mother who had primary physical custody of her children, but shared joint legal custody with their father, was found to have abused or neglected them. Id. at 387. The children were put in "temporary placement" with their father. Ibid. While the children still resided with their father, the court dismissed the proceedings and "advised the mother that she could seek any custody or parenting time modification through a matrimonial action." Ibid. In reversing, the Court held that a dispositional hearing "must be held to determine the appropriate outcome of the case" and narrowed the central consideration from a best interest standard to "whether the child may be safely returned to the custody of the parent from whom the child was removed." Id. at 402.

The main purpose of a Title Nine case is the protection of children. N.J. Dep't of Child. & Fams., Div. of Youth & Fam. Servs. v. A.L., 213 N.J. 1, 18

71

(2013); see also N.J. Div. of Youth & Fam. Servs. v. J.D. (In re J.B.), 417 N.J. Super. 1, 21 (App. Div. 2010).  As we noted in In re J.B., notwithstanding G.M.'s prescription to apply a narrower standard for dispositional hearings, "we do not agree the holding limits the Family Court's role to examine only whether the offending parent has satisfactorily remediated the initial harm that caused the children's removal.  Such a position presents too simplistic an approach."  Id. at 21.  Moreover, as the Court has observed, "[w]hen custody issues become intertwined with child-protection actions, then dispositional questions that lie at the intersection of the two matters become complicated by a parent's delay in achieving circumstances that make it safe for the child to return to the former custodial parent."  N.J. Dep't of Child. & Fams., Div. of Youth & Fam. Servs. v. I.S., 214 N.J. 8, 41 (2013).

Here, Rae confusingly argues that the court erred by failing to grant her a dispositional hearing, while simultaneously arguing against the dispositional order entered on October 21, 2021.  However, Judge Marino noted several times on the record, with Rae present, that the October 18th hearing was a dispositional hearing, stating "I'm here today […] for disposition[.]  […]  I'm not going to go back and talk about things that happened that aren't directly related to disposition today."  Further, the judge entered a dispositional order on

72

October 21, 2021, which expressly states that it was a disposition having been brought before the court on October 18, 2021.  We therefore conclude that the October 18, 2021 hearing was a dispositional hearing.

We turn now to Rae's assertion the court erred by entering a dispositional order under N.J.S.A. 9:6-8.54, placing Ruby and Elle in Len's care indefinitely instead of for a period of twelve-months.  In responding to this argument, the Division maintains that the court released the children to Len under N.J.S.A. 9:6-8.53.[21]

Here, the court did not remove the children from Rae's custody and "place" them with a non-custodial parent, rather, the court entered an order continuing the physical custody of Elle and Ruby with Len—who already had legal and physical custody of both children.

---

[21] The court did not identify a statutory provision on which it relied.  The order, however, states that "physical custody of the child(ren), [Elle] and [Ruby], shall be continued with [Len]" and, after listing specific Division services expected of each party, the order concludes by stating, "[a]nd this matter shall return to court for Compliance Review on January 25th, 2022[.]"  N.J.S.A. 9:6-8.54 addresses placement of children in the custody of "a relative or other suitable person of the Division[,]" whereas N.J.S.A. 9:6-8.53 addresses those circumstances where the children are released back to the custody of the parent or guardian "responsible for his or her care at the time of the filing of the complaint."

While Rae asserts that N.J.S.A. 9:6-8.54 applies and sets a twelve-month maximum duration for dispositional orders, this argument ignores that the mandatory durational requirement applies where the court enters an order of "supervision" placing the child under the Division's supervision for a period of time not to exceed twelve months. Here, the dispositional order entered on October 21, 2021 released Ruby and Elle to Len setting forth that Rae's visits would remain suspended until she satisfied reasonable conditions, including engaging in services with the Division.

We are persuaded that the one-year limit imposed in N.J.S.A. 9:6-8.53(b) pertains to an order of supervision, not to an order of protection which understandably has no prescribed duration. Therefore, we reject Rae's argument that under N.J.S.A. 9.6-8.53, an order of protection may not be in place for more than twelve months, or one year.

Finally, we address Rae's argument the court erred by dismissing the Title Nine litigation without a G.M. hearing. The Division contends that Rae had failed to comply with court ordered services, resulting in protracted litigation—a sentiment that was shared by the Law Guardians for Elle and Ruby—without an end in sight and, thus, dismissal was warranted.

A-0632-22

Applying the law as we previously stated above, we note that the record shows that following the fact-finding hearing, which concluded on August 10, 2021, with a finding of physical abuse or neglect against Rae, the court reconvened for a dispositional hearing on October 18, 2021 pursuant to N.J.S.A. 9:6-8.50. The court ordered continuing legal custody of both Ruby and Elle with Rae and Len, but granted only Len physical custody and continued the suspension of Rae's parenting time pursuant to the criminal no-contact order, noting that "[a] criminal no contact order was entered as [Rae's] contact with [Elle]. Based on the best interest of [Elle], visitation for both children shall be suspended until the criminal no contact provision can be address[ed]." The order also noted that both Ruby and Elle's therapists "are not recommending visitation for [Ruby] and [Elle] until both children are able to visit together. Furthermore, [Ruby's therapist] recommends that [Rae's] visitation should not resume until she has engaged in services." Moreover, three subsequent orders entered on January 25, 2022, May 10, 2022[22], and July 19, 2022, continued this custody and parenting time arrangement.

---

[22] At the May 10, 2022 hearing, Elle's attorney asked the court to address how the case could move forward because "notwithstanding the instructions from the court, we go in circles at every court hearing regarding the domestic violence

During the court's January 25, 2022 compliance review hearing, the Division highlighted several areas where Rae had failed to comply with its orders, including failing to appear for a December 15, 2021 evaluation, failing to engage in individual counseling with the Division's therapist, not making "herself available to meet with the Division on a monthly basis to address services," and failing to complete a budget, provide her work schedule, or advise the Division of her current housing situation.

A different judge, however, presided over the last compliance review hearing on July 19, 2022, and stated that a best interest hearing was "not needed," adding that her "practice [was] not to discuss best interest hearings unless a defendant specifically requests one."

We have no quarrel with the fact that a best interest hearing is required under Title Nine, however, we find persuasive and cannot ignore that on July 19, 2022, the court entered an order granting Rae fourteen days to file a motion for a best interest hearing, and she did not.

The record shows that Rae emailed counsel and the court an undated letter referencing "an email sent on July 19, 2022 to all [c]ounsel representing parties

orders that are in place, the fifty-fifty custody from Judge McDonald. We can't seem to move forward."

in the above matter objecting to the verbiage of the [five]-page Court order."

The record also shows that court staff responded to Rae and advised that her submission was deficient, noting that they had previously explained the deficiency. However, Rae never filed a motion for a best interest hearing. Moreover, there is ample support in the record that the decision to dismiss the Title Nine action was made based on the representations of the Division and Law Guardians regarding Rae's lengthy history of noncompliance with any of the services offered by the Division and that after the fact-finding and dispositional hearing, successive compliance review hearings concluded without any change by Rae.

There is also no factual dispute that Rae did not engage in services needed to resume supervised visits with her children in the intervening months between the dispositional hearing and the dismissal of the litigation. Having failed to comply with the Divisions services and to seek a best interest hearing to restore parental time with Elle and Ruby who were reported to be doing well in the custody of their father, the court's subsequent dismissal order was not "unlawful" as Rae argues. And, we find no support for Rae's contention that under these circumstances, the court was required to hold another plenary hearing before dismissal of the Title Nine litigation. <u>Hand v. Hand</u>, 391 N.J.

Super. 102, 105 (App. Div. 2007) ("A plenary hearing is required when the submissions show there is a genuine and substantial factual dispute regarding the welfare of the children, and the trial judge determines that a plenary hearing is necessary to resolve the factual dispute."). Here, there was no dispute because Rae had failed to file a motion and, thus, there was no issue concerning the best interest of the children. Again, the main purpose of a Title Nine case is the protection of children. N.J. Dep't. of Child. & Fams., Div. of Youth & Fam. Servs., 213 N.J. 1, 18. The Division had advised the court in the compliance review hearings that the children were doing well with Len and that the no-contact order in the criminal matter remained active and precluded Rae from any contact with Elle. Against this backdrop, we reject Rae's claims that the court's order terminating the Title Nine litigation must be reversed.

In sum, having reviewed this extensive record, we have no cause to disturb the judges' challenged orders finding that Rae abused or neglected Elle, placing Ruby and Elle in the care and custody of their faither, Len, and terminating the Title Nine litigation, continuing physical custody of both Ruby and Elle with Len.

A-0632-22

To the extent we have not specifically addressed any of Rae's remaining arguments, we conclude they are without sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0632-22